1 **VICTOR PIPPINS**
California State Bar No. 251953
2 **MICHELLE BETANCOURT**
California State Bar No. 215035
3 **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
4 San Diego, CA 92101-5008
Telephone: (619) 234-8467
5 victor_pippins@fd.org
michelle_betancourt@fd.org
6

7 Attorneys for Ms. Martinez-Jimenez

8

9                     UNITED STATES DISTRICT COURT

10                     SOUTHERN DISTRICT OF CALIFORNIA

11 UNITED STATES OF AMERICA,              )  Case No. 08cr2034-IEG
                                          )
12              Plaintiff,                )  DATE:      September 15, 2008
                                          )  TIME:      11:30 a.m.
13 v.                                     )
                                          )  **DEFENDANT'S NOTICE OF MOTIONS AND**
14 SOLEDAD MARTINEZ-JIMENEZ,              )  **MOTIONS *IN LIMINE* TO:**
                                          )
15              Defendant.                )  (1)   DISMISS INDICTMENT FOR GRAND JURY
                                          )        MISINSTRUCTION;
16                                        )  (2)   DISMISS COUNT ONE OF INDICTMENT;
                                          )  (3)   SUPPRESS  FRUITS  OF  UNLAWFUL
17                                        )        DETENTION;
                                          )  (4)   SUPPRESS EVIDENCE FROM SEARCH OF
18                                        )        CELLULAR PHONE;
                                          )  (5)   SUPPRESS STATEMENTS;
19                                        )  (6)   PRECLUDE    GOVERNMENT    FROM
                                          )        INTRODUCING     STATEMENTS
20                                        )        REGARDING     SMUGGLING
                                          )        ARRANGEMENTS;
21                                        )  (7)   EXCLUDE  EXPERT  WITNESS  FOR
                                          )        GOVERNMENT;
22                                        )  (8)   PREVENT COPY OF INDICTMENT FROM
                                          )        BEING SENT INTO THE JURY ROOM;
23                                        )  (9)   ALLOW   ATTORNEY   CONDUCTED
                                          )        VOIR DIRE;
24                                        )  (10)  ORDER PRODUCTION OF GRAND JURY
                                          )        TRANSCRIPT;
25                                        )  (11)  ORDER  PRODUCTION  OF  JENCKS
                                          )        MATERIAL PRIOR TO TRIAL;
26                                        )  (12)  EXCLUDE DEMEANOR EVIDENCE;
                                          )  (13)  ALLOW EACH JUROR TO HAVE A COPY
27                                        )        OF JURY INSTRUCTIONS;
                                          )  (14)  PRECLUDE ADMISSION OF 404(B) AND
28                                        )        609 EVIDENCE;

1                                     )   (15)  EXCLUDE POVERTY EVIDENCE;

)   (16)  EXCLUDE GOVERNMENT CASE AGENT;

2                                     )         AND

)   (17)  EXCLUDE GOVERNMENT CASE AGENT

3

4 TO: KAREN HEWITT, UNITED STATES ATTORNEY; AND
STEPHEN MILLER, ASSISTANT UNITED STATES ATTORNEY:

5

6     PLEASE TAKE NOTICE that, on September 15, 2008, at 11:30 a.m., or as soon thereafter as counsel

7 may be heard, Defendant Soledad Martinez-Jimenez, by and through her attorneys, Victor Pippins,

8 Michelle Betancourt, and Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting

9 the following motions *in limine*.

10                                 **MOTIONS**

11     Defendant Soledad Martinez-Jimenez, by and through her attorneys, Victor Pippins,

12 Michelle Betancourt, and Federal Defenders of San Diego, Inc., moves this Court pursuant to the United States

13 Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law, and local

14 rules for an order:

15     (1)  Dismiss Indictment for Grand Jury Misinstruction;
       (2)  Dismiss Count One of Indictment;

16    (3)  Suppress Fruits of Unlawful Detention;
       (4)  Suppress Evidence Gained from Search of Cellular Phone;

17    (5)  Suppress Statements;
       (6)  Preclude Government from Introducing Statements about Smuggling Arrangements;

18    (7)  Exclude Expert Witnesses for Government;
       (8)  Court Should Not Send Indictment into Jury Room;

19    (9)  Court Should Allow Attorney Conducted Voir Dire;
      (10)  Court Should Order Production of Grand Jury Transcripts;

20    (11)  Court Should Order Production of Jencks Material Before Trial;
      (12)  Court Should Exclude Demeanor Evidence;

21    (13)  Court Should Allow Each Juror to Have a Copy of the Jury Instructions;
      (14)  Court Should Preclude Admission of 404(b) and 609 Evidence;

22    (15)  Court Should Exclude Poverty Evidence;
      (16)  Court Exclude the Government's Case Agent; and

23    (17)  Court Should Sever Defendants

24 / / /

25 / / /

26 / / /

27 / / /

28 / / /

1    These motions in limine are based upon the instant motions in limine and notice of motions in limine,

2  the attached statement of facts and memorandum of points and authorities, the files and records in the above-

3  captioned matter, and any and all other materials that may come to this Court's attention prior to or during the

4  hearing of these motions.

5                                                     Respectfully submitted,

6

DATED:    September 2, 2008                           /s/ Victor Pippins

7                                                     **VICTOR PIPPINS**
                                                      **MICHELLE BETANCOURT**
8                                                     Federal Defenders of San Diego, Inc.
                                                      Attorneys for Ms. Martinez-Jimenez
9                                                     victor_pippins@fd.org
                                                      michelle_betancourt@fd.org
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **VICTOR PIPPINS**
California State Bar No. 251953
2  **MICHELLE BETANCOURT**
California State Bar No. 215035
3  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
4  San Diego, CA 92101-5008
Telephone:  (619) 234-8467
5  victor_pippins@fd.org
michelle_betancourt@fd.org
6

7  Attorneys for Ms. Martinez-Jimenez

8

9                          UNITED STATES DISTRICT COURT

10                        SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| UNITED STATES OF AMERICA,  )  | Case No. 08cr2034-IEG |

12                                              )
              Plaintiff,                  )    DATE:        September 15, 2008
13                                              )    TIME:        11:30 p.m.
   v.                                           )
14                                              )    **POINTS AND AUTHORITIES IN SUPPORT OF**
   **SOLEDAD MARTINEZ-JIMENEZ,**   )    **MS. MARTINEZ-JIMENEZ'S MOTIONS AND**
15                                              )    **MOTIONS *IN LIMINE***
              Defendant.              )
16

17  TO:  KAREN HEWITT, UNITED STATES ATTORNEY; AND
          STEPHEN MILLER, ASSISTANT UNITED STATES ATTORNEY:
18

19                                      **I.**

20                          **STATEMENT OF FACTS**

21        The following statement of facts is based, in part, on materials received from the government.

22  Ms. Martinez-Jimenez does not accept this statement of facts as her own, and reserves the right to take a

23  contrary position at motion hearings and trial.  The facts alleged in these motions are subject to amplification

24  and/or modification at the time these motions are heard.

25        On June 3, 2008, Horse Border Patrol Agent Eleodoro Leyva responded to a seismic intrusion sensor

26  activation in an area known as "The Nineties".  This area is approximately 5 miles west of the San Ysidro,

27  California Port of Entry and about 200 yards north of the international border.  At about the same time,

28  Agent Leyva was alerted by Border Patrol Agent Monica Monroy that a man and a horse could be found in

1  the area of the sensor activation. Agent Leyva located that individual, who was later identified as

2  Jose Guadalupe Gonzaga-Ceja. Mr. Gonzaga-Ceja allegedly claimed to be a citizen and national of Mexico

3  with no legal right to be or remain in the United States. Mr. Gonzaga-Ceja then explained that an unidentified

4  person (who was never located) brought a horse to the border fence and switched places with Mr. Gonzaga-

5  Ceja, so that Mr. Gonzaga-Ceja was on the horse, in an attempt to sneak into the United States.

6       After placing Mr. Gonzaga-Ceja under arrest, Agent Leyva was informed by the scope operator that there

7  were two other individuals in the area. Soon after, Agent Leyva and Agent Luis Gonzalez approached two

8  individuals riding on a single horse. These two riders were identified as Ernest Guerrero-Rivera and Soledad

9  Martinez-Jimenez. Mr. Guerrero-Rivera was riding on the front of the horse, with Ms. Martinez-Jimenez in

10  the rear. Both Mr. Guerrero-Rivera and Ms. Martinez-Jimenez denied knowing Mr. Gonzaga-Ceja. Both

11  were then taken into custody. Mr. Gonzaga-Ceja was taken into custody and held as a Material Witness.

12       While in custody following her arrest, Ms. Martinez-Jimenez was interrogated for over an hour. Without

13  receiving consent, agents searched the memory of Ms. Martinez-Jimenez' cellular phone, and then questioned

14  her about particular phone numbers found as a result of the search.

15       On June 5, 2008, a complaint was filed in the United States District Court for the Southern District of

16  California, charging Soledad Martinez-Jimenez and Ernest Guerrero-Rivera with violating Title 8,

17  United States Code Sec. 1324(a)(2)(B)(iii), Bringing in Aliens without Presentation.

18       On June 18, 2008, an indictment was handed down by the January 2007 Grand Jury for the Southern

19  District of California, charging both defendants with a violation of Title 8, United States Code,

20  Sec. 1324(a)(2)(b)(ii) for Bringing in Illegal Aliens for Financial Gain and Aiding and Abetting, and with

21  violating Title 8, United States Code Sec. 1324(a)(1)(A)(2) for Transportation of Illegal Aliens and Aiding

22  and Abetting. Both defendants entered not guilty pleas.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

**II.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE THE FIFTH AMENDMENT BY DEPRIVING MS. BAHNMILLER OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.   Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January 11, 2007.  See Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[1] These instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[2]

**1.   Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even

---

[1]  See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[2]  The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury.  Ms. Bahnmiller requests that the video presentation be produced.  See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[3]  See also id. at 20 ("You're all about probable cause.").

1  though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may

2  be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

3  because the grand jurors disagree with a proposed prosecution.

4         Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to

5  an instance in the grand juror selection process in which he excused three potential jurors.  See id. at 8.

6              I've gone over this with a couple of people.  You understood from the questions and
               answers that a couple of people were excused, I think three in this case, because they
7              could not adhere to the principle that I'm about to tell you.

8  Id.  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their

9  disagreement with Congress.  See id. at 8-9.  Thus, Judge Burns not only instructed the grand jurors on his

10 view of their discretion; he enforced that view on pain of being excused from service as a grand juror.

11        Examination of the voir dire transcript, which contains additional instructions and commentary in the

12 form of the give and take between Judge Burns and various prospective grand jurors, reveals Judge Burns's

13 emphasis on the singular duty to determine whether or not probable cause exists, and his statement that grand

14 jurors cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous

15 series of instructions already given to the grand jury venire.  In one of his earliest substantive remarks, Judge

16 Burns makes clear that the grand jury's sole function is probable cause determination.

17             [T]he grand jury is determining really two factors: "do we have a reasonable belief that
               a crime was committed?  And second, do we have a reasonable belief that the person
18             that they propose that we indict committed the crime?"

19             If the answer is "yes" to both of those, then the case should move forward.  If the
               answer to either of the questions is "no," then the grand jury should not hesitate and not
20             indict.

21 See Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear that the

22 term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it

23 addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

24 committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

25 crime."

26        Equally revealing are Judge Burns's interactions with two potential grand jurors who indicated that, in

27 some unknown set of circumstances, they might decline to indict even where there was probable cause.

28 Because of the redactions of the grand jurors' names, Ms. Bahnmiller will refer to them by occupation.  One

1  is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).

2  The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were

3  not an effective use of resources.  See id. at 16.  The CSW was also troubled by certain unspecified

4  immigration cases.  See id.

5      Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW.

6  He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district,

7  such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.  Rather, he

8  provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not

9  capable of expression in the context of grand jury service.

10          Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just
           as the defendant is ultimately entitled to a fair trial and the person that's accused is

11          entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is
           the United States entitled to a fair judgment.  If there's probable cause, then the case

12          should go forward.  *I wouldn't want you to say*, "well, yeah, there's probable cause, but
           I still don't like what our government is doing.  I disagree with these laws, so I'm not

13          going to vote for it to go forward."  If that is your frame of mind, the probably you
           shouldn't serve.  Only you can tell me that.

14

15  See id. at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

16  juror know that he would not want him or her to decline to indict in an individual case where the grand juror

17  "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause.  See id.

18  Such a case "should go forward."  See id.  Given that blanket proscription on grand juror discretion, made

19  manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

20  charge even if [the CSW] thought the evidence warranted it."  See id.  Again, Judge Burns's question provided

21  no context; he inquired regarding "a case," a term presumably just as applicable to possession of a small

22  amount of medical marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror

23  listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them

24  to vote "no bill" in the face of a showing probable cause.

25      Just in case there may have been a grand juror that did not understand his or her inability to exercise

26  anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA.  REA

27  first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding

28  "medical marijuana."  See id. at 24.  Judge Burns first sought to address REA's concerns about medical

1 marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations

2 into account.

3      Well, those things -- the consequences of your determination shouldn't concern you in
       the sense that penalties or punishment, things like that -- we tell trial jurors, of course,
4      that they cannot consider the punishment or the consequence that Congress has set for
       these things. We'd ask you to also abide by that. We want you to make a business-like
5      decision of whether there was a probable cause. . . .

6 Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went

7 on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

8      In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

9 That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand

10 juror is obligated to vote to indict if there is probable cause.

11      I can tell you sometimes I don't agree with some of the legal decisions that are
        indicated that I have to make. But my alternative is to vote for someone different, vote
12      for someone that supports the policies I support and get the law changed. It's not for
        me to say, "well, I don't like it. So I'm not going to follow it here."
13
        You'd have a similar obligation as a grand juror even though you might have to grit
14      your teeth on some cases. Philosophically, if you were a member of congress, you'd
        vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd
15      vote against criminalizing some drugs.
        That's not what your prerogative is here. You're prerogative instead is to act like a
16      judge and say, "all right. This is what I've to deal with objectively. Does it seem to
        me that a crime was committed? Yes. Does it seem to me that this person's involved?
17      It does." And then your obligation, if you find those to be true, would be to vote in
        favor of the case going forward.
18

19 Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both

20 questions are answered in the affirmative, lead to an "obligation" to indict.

21      Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm,

22 Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in

23 every case in which there was probable cause.

24      The Court: Do you think you'd be inclined to let people go in drug cases even though
        you were convinced there was probable cause they committed a drug offense?
25      REA: It would depend on the case.
        The Court: Is there a chance that you would do that?
26      REA: Yes.
        The Court: I appreciate your answers. I'll excuse you at this time.
27

28 / / /

1   Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his

2   political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

3   should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

4   indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns

5   made no effort to explore REA's views; he did not ascertain what sorts of cases would prompt REA to

6   hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

7   because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[4]

8   See id. at 27. That is why even the "chance," see id., that a grand juror might not vote to indict was too great

9   a risk to run.

10      **2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory
                Evidence.**

11

12          In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand

13   jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at

14   20.[5]

15   _____

16      [4] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will
     have determined the existence of probable cause "in most circumstances" before it has been presented with
17   any evidence. See Ex. A at 6. This instruction created an imprimatur of finding probable cause in each case
     because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury
18   for indictment at all. The Grand Jury was informed that it merely was redundant to the magistrate court "in
     most circumstances." See id. This instruction made the grand jury more inclined to indict irrespective of the
19   evidence presented.
20
     [5] These instructions were provided in the midst of several comments that praised the United States
21   attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that
     the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in
22   good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go
     even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney,
23   whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's
     view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you
24   are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a
     presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business
25   of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't
     substantiate the charges against.").
26
             Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the
27   error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions
     implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the
28

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence*.

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007

---

government attorneys to act inappropriately or to present cases for indictment where no probable cause existed. In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

[6]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1  Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a

2  bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to

3  exercise any quasi-prosecutorial discretion.  That is not the institution the Framers envisioned.  See United

4  States v. Williams, 504 U.S. 36, 49 (1992).

5       For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II

6  majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding

7  whether a particular prosecution shall be instituted or followed up, performs much the same function as a

8  grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)).

9  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J.,

10 dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial.").  See

11 also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not

12 obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand

13 jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor."  Id.  See

14 Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury,

15 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important

16 attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included

17 in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

18      Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in

19 Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

20          The grand jury thus determines not only whether probable cause exists, but also
           whether to "charge a greater offense or a lesser offense; numerous counts or a single
21          count; and perhaps most significant of all, a capital offense or a non-capital offense --
           all on the basis of the same facts.  And, significantly, the grand jury may refuse to
22          return an indictment even "'where a conviction can be obtained.'"

23 Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

24 the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls

25 not only the initial decision to indict, but also significant questions such as how many counts to charge and

26 whether to charge a greater or lesser offense, including the important decision whether to charge a capital

27 crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas II

28 majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse

9                                                    08cr2034-IEG

1  to indict someone even when the prosecutor has established probable cause that this individual has committed

2  a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J.,

3  dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J.,

4  dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.

5  But not in Judge Burns's instructions.

6  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established in**
   **Both *Vasquez* and *Navarro-Vargas II*.**
7

8       The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand jury

9  to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous decision in

10 Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon every finding

11 of probable cause because the term "should" may mean "what is probable or expected."  299 F.3d at 1164

12 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge Hawkins ably

13 pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of

14 the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand

15 jurors, and thus to circumscribe the grand jury's constitutional independence.").  See also id. ("The 'word'

16 should is used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language Guide

17 1579 (1999) (brackets in original)).

18      The debate about what the word "should" means is irrelevant here; the instructions here make no such

19 fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not choose

20 not to indict in the event of what appears to them to be an unfair application of the law: should "you disagree

21 with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

22 even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the instruction flatly bars the

23 grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would

24 read this language as instructing, or even allowing, him or her to assess "the need to indict."  Vasquez, 474

25 U.S. at 264.

26      While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether

27 an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that he could only

28 mean "should" in the obligatory sense.  For example, when addressing a prospective juror, Judge Burns not

1    only told the jurors that they "should" indict if there is probable cause, he told them that if there is not probable

2    cause, "then the grand jury should hesitate and not indict." See id. at 8.  At least in context, it would strain

3    credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury

4    to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was not.

5         The full passage cited above effectively eliminates any possibility that Judge Burns intended the

6    Navarro-Vargas spin on the word "should."

7              [T]he grand jury is determining really two factors: "do we have a reasonable belief that
              a crime was committed?  And second, do we have a reasonable belief that the person
8              that they propose that we indict committed the crime?"

9              If the answer is "yes" to both of those, then the case should move forward.  If the
              answer to either of the questions is "no," then the grand jury should not hesitate and not
10             indict.

11   See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially states that

12   if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have intended to "leav[e]

13   room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205

14   (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of protecting the

15   innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities

16   continue to include both the determination whether there is probable cause and the protection of citizens

17   against unfounded criminal prosecutions.") (citation omitted).

18        By the same token, if Judge Burns said that "the case should move forward" if there is probable cause,

19   but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-

20   Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would have to have intended two

21   different meanings of the word "should" in the space of two consecutive sentences.  That could not have been

22   his intent. But even if it were, no grand jury could ever have had that understanding.[7]  Jurors are not presumed

23   to be capable of sorting through internally contradictory instructions.  See generally United States v. Lewis,

24   67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the

25   jury followed the correct one") (citation, internal quotations and brackets omitted).

26

27        [7]  This argument does not turn on Ms. Bahnmiller's view that the Navarro-Vargas/Marcucci reading
     of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which
28   the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-
     Vargas/Marcucci reading as a possibility.

1   Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

2   clear to the grand jurors that "should" was not merely suggestive, but obligatory:

3       (1)   The first occasion occurred in the following exchange when Judge Burns conducted voir dire and

4   excused a potential juror (CSW):

5           The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't
            want you to say, "Well, yeah, there's probable cause.  But I still don't like what the
6           government is doing.  I disagree with these laws, so I'm not going to vote for it to go
            forward."  If that's your frame of mind, then probably you shouldn't serve.  Only you
7           can tell me that.
            Prospective Juror: Well, I think I may fall in that category.
8           The Court: In the latter category?
            Prospective Juror: Yes.
9           The Court: Where it would be difficult for you to support a charge even if        y o u
            thought the evidence warranted it?
10          Prospective Juror: Yes.
            The Court: I'm going to excuse you then.

11

12  See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

13  juror.  Even if the prospective juror did not like what the government was doing in a particular case, that case

14  "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See id. ("I

15  wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent judgment

16  was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to

17  the exercise of discretion by any other prospective grand juror.

18      (2)   In an even more explicit example of what "should" meant, Judge Burns makes clear that it there

19  is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

20  Court    . . . It's not for me to say, "Well, I don't like it.  So I'm not going to follow it here."

21          You'd have a similar *obligation* as a grand juror even though you might have to grit
            your teeth on some cases.  Philosophically, if you were a member of Congress, you'd
22          vote against, for example, criminalizing marijuana.  I don't know if that's it, but you'd
            vote against criminalizing some drugs.

23
            That's not what your *prerogative* is here.  Your prerogative instead is act like a judge
24          and to say, "All right.  This is what I've got to deal with objectively.  Does it seem to
            me that a crime was committed?  Yes.  Does it seem to me that this person's involved?
25          It does." *And then your obligation, if you find those things to be true, would be to vote
            in favor of the case going forward*.

26

27  Id. at 26-27 (emphasis added).  After telling this potential juror (REA) what his obligations and prerogatives

28  were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were

convinced there was probable cause they committed a drug offense?" <u>Id.</u> at 27.  The potential juror responded: "It would depend on the case." <u>Id.</u>  Nevertheless, that juror was excused.  <u>Id.</u> at 28.  Again, in this context, and contrary to the situation in <u>Navarro-Vargas</u>, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case."  Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many.  But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(3)    As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here." <u>See</u> <u>id.</u> at 61.

(4)    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." <u>See</u> Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things.  We'd ask you to also abide by that.*  We want you to make a business-like decision of whether there was a probable cause. ...

/ / /

1   See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause" would

2   obviously leave no role for the consideration of penalty information.

3       The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

4   penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

5   United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two

6   reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that context,

7   as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there

8   ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized

9   consideration of penalty information.  See 474 U.S. at 263.

10      Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

11  again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there

12  was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct

13  contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand

14  juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in

15  Vasquez:

16          The grand jury does not determine only that probable cause exists to believe that a
            defendant committed a crime, or that it does not.  In the hands of the grand jury lies the
17          power to charge a greater offense or a lesser offense; numerous counts or a single
            count; and perhaps most significant of all, a capital offense or a non-capital offense –
18          all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict
            in every case where a conviction can be obtained."

19

20  474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

21  dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the

22  initial decision to indict, but also significant decisions such as how many counts to charge and whether to

23  charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor

24  would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See

25  id. at 264.  Judge Burns's grand jury is not Vasquez's grand jury.  The instructions therefore represent

26  structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand

27  jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must

28  therefore be dismissed.  Id.

1    The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the instructions'

2  excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its independence -- [to]

3  the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200.

4  As a result, the majority discounts the effect that a judge's instructions may have on a grand jury because "it

5  is the *structure* of the grand jury process and its *function* that make it independent." Id. at 1202 (emphases

6  in the original).

7    Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the 'structure'

8  and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability of many of

9  its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting).  The flaw in the

10  majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond making a

11  probable cause determination ... unconstitutionally undermines the very structural protections that the majority

12  believes save[] the instruction." Id.  After all, it is an "'almost invariable assumption of the law that jurors

13  follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that "invariable

14  assumption" were to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez.

15  Indeed, "there is something supremely cynical about saying that it is fine to give jurors erroneous instructions

16  because nothing will happen if they disobey them." Id.

17    In setting forth Judge Hawkins' views, Ms. Bahnmiller understands that this Court may not adopt them

18  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

19  Rather, she sets them forth to urge the Court *not to extend* what is already untenable reasoning.

20    Here, again, the question is not an obscure interpretation of the word "should", especially in light of the

21  instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court

22  in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right

23  to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both

24  Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

25    Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they

26  enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative,

27  excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex.

28  B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors

1    who are no longer there, likely because they expressed their willingness to act as the conscience of the

2    community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising

3    its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting

4    as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 &  n.6 (D.C.

5    Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own

6    initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge

7    Burns has both fashioned his own rules and enforced them.

8    **D.    The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present
        Exculpatory Evidence to the Grand Jury.**
9

10        In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued

11   that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory

12   evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law.  See

13   504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory' judicial authority

14   exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority "to dismiss an

15   indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation

16   of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to

17   ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means

18   of *prescribing* such standards of prosecutorial conduct in the first instance."  Id. at 47 (emphasis added).  The

19   federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury

20   procedure."  Id. at 50.  As a consequence, Williams rejected the defendant's claim, both as an exercise of

21   supervisory power and as Fifth Amendment common law.  See id. at 51-55.

22        Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

23   present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

24            Now, again, this emphasizes the difference between the function of the grand jury and
              the trial jury.  You're all about probable cause.  If you think that there's evidence out
25            there that might cause you say "well, I don't think probable cause exists," then it's
              incumbent upon you to hear that evidence as well.  As I told you, in most instances, *the*
26            *U.S. Attorneys are duty-bound to present evidence that cuts against what they may be*
              *asking you to do if they're aware of that evidence.*
27

28   / / /

1   Id. (emphasis added). Moreover, the district court later returned to the notion of the prosecutors and their
2   duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of
3   [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See
4   id. at 27. The Ninth Circuit has already concluded it is likely this final comment is "unnecessary." See
5   Navarro-Vargas, 408 F.3d at 1207.

6       This particular instruction has a devastating effect on the grand jury's protective powers, particularly if
7   it is not true. It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not
8   conveyed by the previous instruction: "You're all about probable cause." See Ex. A at 20. Thus, once again,
9   the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably
10   unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be
11   excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should
12   consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will
13   present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause,
14   but, if none is presented by the government, they can presume that there is none. After all, "in most instances,
15   the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if
16   they're aware of that evidence." See id. Moreover, during voir dire, Judge Burns informed the jurors that "my
17   experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against
18   the charge, you'll be informed of that. *They have a duty to do that*." See Ex. B at 14-15 (emphasis added).
19   Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound"
20   prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will
21   be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

22       These instructions create a presumption that, in cases where the prosecutor does not present exculpatory
23   evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory
24   evidence was presented, would proceed along these lines:

25       (1)  I have to consider evidence that undercuts probable cause.

26       (2)  The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence
27            to me, if it existed.

28       (3)  Because no such evidence was presented to me, I may conclude that there is none.

1   Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence

2   presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound

3   prosecutor would have presented it.

4        The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

5   prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

6   probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

7   of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

8   the Fifth Amendment.

9                                                        **III.**

10                                       **MOTION SEEKING JOINDER**

11        With regards to the sufficiency of the indictment as to Count One, Ms. Martinez-Jimenez stands equally

12  situated as Mr. Guerrero and therefor seeks to adopt the legal arguments contained in Mr. Guerrero's Motion

13  to Dismiss Count One.  For the limited purpose of challenging this count of the indictment, their positions are

14  identical.  Permitting Ms. Martinez-Jimenez to join in her co-defendant's Motion to Dismiss Count One of

15  the Indictment would be time effective and cost effective.

16                                                        **IV.**

17  **ALL EVIDENCE GAINED FROM THE ARREST OF MS. MARTINEZ-JIMENEZ SHOULD BE
    SUPPRESSED AS THE FRUIT OF AN UNLAWFUL DETENTION.**

18

19        The Fourth Amendment's prohibition of unreasonable searches and seizures extends to seizures of the

20  person that would fall short of a traditional arrest.  See United States v. Brignoni-Ponce, 422 U.S. 873, 878

21  (1975).  An officer may not detain a person without "a particularized and objective bases for suspecting the

22  particular person stopped of criminal activity."  United States v. Cortez, 449 U.S. 411, 417-418 (1981).  This

23  "objective basis, or 'reasonable suspicion' must consist of 'specific, articulable facts which, together with

24  objective and reasonable inferences, form the basis for suspecting that the particular person detained is

25  engaged in criminal activity.'"  See Terry v. Ohio, 392 U.S. 1,21 (1968).

26        Ms. Martinez-Jimenez was detained because she reasonably believed that she was not free to leave.  This

27  belief was rooted in the fact that she was in a relatively remote location, being questioned about a serious

28  crime by armed law enforcement agents.  The arresting officer did not have reasonable suspicion to detain Ms.

1  Martinez-Jimenez and question her about smuggling activities. The arresting agent's alleged justification for

2  the stop of the Ms. Martinez is the fact she was in the general vicinity of a person arrested on suspicion of

3  being an alien found in the United States. This suspected alien, Jose Guadalupe Gonzaga-Ceja, told the agents

4  that he was in the United States without valid immigration documents and was being smuggled on horseback.

5  Moments after his arrest, the agents allegedly received a call from the scope operator, informing them that

6  there were two subjects on a horse in the same area.. These two individuals were Ms. Martinez-Jimenez and

7  her co-defendant. Nothing in the record indicates how close the two defendants in this case were to the

8  suspected alien at the time of his arrest, or how many other horse riders were also in the area. The information

9  in the Report of Investigation fails to provide facts known to the arresting agents at the time of their seizure

10  of Ms. Martinez-Jimenez that would provide reasonable articulable suspicion that she was involved in criminal

11  activity. Thus, the detention of Ms. Martinez-Jimenez was unconstitutional.

12      As a consequence,  all evidence and the fruits of the unconstitutional detention (*e.g.*, statements, all

13  evidence) must be suppressed. See Wong Sun v. United States, 371 U.S. 471 (1963); see also United States

14  v. Romero-Bustamante, 337 F.3d 1104 (9th Cir. 2003) (finding Fourth Amendment violation, suppressing

15  alien material witnesses, and requiring dismissal of indictment). This Court should accordingly grant the

16  motion.

17                                              **V.**

18  **ALL INFORMATION DERIVED FROM THE WARRANTLESS SEARCH OF THE CELLULAR**
    **TELEPHONE MUST BE SUPPRESSED**

19

20      This Court should suppress all evidence seized during the warrantless search of the electronic data stored

21  on Ms. Martinez-Jimenez cellular telephone. The warrantless search and seizure of the stored data violated

22  both the Fourth Amendment and the Electronic Communication Privacy Act ("ECPA"). In this case, at some

23  point after Ms. Martinez-Jimenez was arrested, federal agents searched the stored data from his cellular

24  telephone, and seized (by recording) information contained therein. Because this information was seized

25  without a warrant, and in the absence of a valid exigent circumstance, all evidence seized or derived from the

26  search and seizure of the stored data must be suppressed. In the alternative, and a minimum, this Court should

27  conduct an evidentiary hearing to determine the circumstances surrounding the search and seizure of the stored

28  data.

**A.    The Search of Ms. Martinez-Jimenez Cellular Phone Violated the Fourth Amendment.**

The Fourth Amendment of the United State Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV.  Subject to only a few specifically established and well delineated exceptions, warrantless searches are *per se* unreasonable under the Fourth Amendment.  Mincey v. Arizona, 437 U.S. 385, 390 (1978).  The burden is on the government to show the reasonableness of a warrantless search.  U.S. v. Carbajal, 956 F.2d 924, 930 (9th Cir. 1992).

Ms. Martinez-Jimenez had a reasonable expectation of privacy in her cellular phone and the electronic information contained therein and, thus has standing to make the instant challenge.  The searching officers failed to obtain a warrant or Ms. Martinez-Jimenez consent prior to searching the electronic contents of her cellular phone.  The warrantless search was not justified as a permissible search incident to arrest, a permissible search due to exigent circumstances, a permissible border search, nor permissible under any other exception to the warrant requirement.  For these reasons, the officers' search of Ms. Martinez-Jimenez cellular phone and the electronic data violated her constitutional rights, and therefore the government should be precluded from admitting or relying upon the fruits of this unlawful search at trial.

**1.    The taking electronic information was a "search" and "seizure" within the meaning of the Fourth Amendment.**

The taking of intangibles – in this case, electronic information contained within the memory of a cellular phone – amounts to "search" and "seizure" within the meaning of the Fourth Amendment.  In United States v. Freitas, 800 F.2d 1451 (9th Cir. 1986), the Ninth Circuit recognized that intangibles could be "seized" within the meaning of the Fourth Amendment.  Id. at 1455.  It is important to note that the court found nothing in Federal Rule of Criminal Procedure 41, which defines "property" as "documents, books, papers, any other tangible objects, and information," FED. R. CRIM. P. 41(a)(2)(A), that could be construed to preclude "intangibles" from the types of things that could be "seized."  Freitas, 800 F.2d at 1455.  In Freitas, the court found that "[w]ithout a doubt, there was a 'search'" where the purpose of police officers' entry into a person's home was "'to seize' intangible, not tangible, property."  Id. at 1455.  The intangible property to be seized in Freitas was information that the police would obtain via visual observation upon entry in the defendant's home; specifically, the police officers would gain access to the premises to visually observe "the

1 status of the suspected clandestine methamphetamine laboratory." Id.  Therefore, as was the case in Freitas,

2 in this case, the officers' search for intangible, stored electronic data (e.g., names, phone numbers, and other

3 data) from the memory of Ms. Martinez-Jimenez cellular phone, by manually browsing the electronic contents

4 and transcribing what they visually observed is, "without a doubt," a "search" within the meaning of the

5 Fourth Amendment.  Id.

6       **2.**    **The defendant has standing to challenge the admission of the unlawfully obtained**

7             **evidence.**

8      There is a subjective and objective expectation of privacy in the stored electronic data and

9 information contained in a cellular phone.  The Supreme Court, in Rakas v. United States, 439 U.S. 128, 148-

10 49 (1978), held that the proponent of a motion to suppress has the burden of establishing that his own Fourth

11 Amendment rights were violated by the challenged search or seizure.  The relevant analysis is whether a

12 defendant can show a violation of her legitimate expectation of privacy in the item seized and in the place

13 searched. United States v. Pollock, 726 F.2d 1456, 1465 (9th Cir. 1984) (citing United States v. Salvucci, 448

14 U.S. 83, 93 (1980)).  "This determination involves two inquiries: first, whether the defendant has exhibited

15 an actual, subjective expectation of privacy, and second, whether that expectation is one that society is

16 prepared to recognize as reasonable."  Id.  (citing Smith v. Maryland, 442 U.S. 735 (1979)).

17      Ms. Martinez-Jimenez had a reasonable expectation of privacy in data stored in her cellular

18 telephone, and this expectation is reasonable.  In United States v. Chan, 830 F.Supp. 531, 534-35 (N.D. Cal.

19 1993) the district court concluded that a defendant had standing to challenge the warrantless search and seizure

20 of data stored in his pager because he had a reasonable expectation of privacy in the electronic contents of the

21 pager. Moreover, unlike pagers, cellular telephones "record incoming and outgoing calls, and can also contain

22 address books, calendars, voice and text messages, email, video and pictures.  Individuals can store highly

23 personal information on their cell phones, and can record their most private thoughts and conversations on

24 their cell phones through email and text, voice and instant messages."  United States v. Park, _F.Supp. 2d.

25 _ 2007 WL 1521573, at *8 (N.D. Cal. May 23, 2007).  Therefore, Ms. Martinez-Jimenez has a reasonable

26 expectation of privacy in the data stored on a cellular telephone.

27 / / /

28 / / /

### 3. This warrantless search was not incident to arrest.

The government has not provided any evidence to the defense that the warrantless search of Ms. Martinez-Jimenez's cellular telephone was incident to a lawful arrest. As a general matter, a "search incident to arrest" is an exception to the prohibition against warrantless searches, justified by the notion that "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape," and "it is ... reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." Chimel v. California, 395 U.S. 752, 762-63 (1969). If the government claims that the search was incident to a lawful arrest, then, at a minimum, this Court should conduct an evidentiary hearing to determine the timing of the search and seizure of the stored data.

### 4. There were no exigent circumstances present which may have justified this warrantless, consentless search.

The government has not provided defense counsel with evidence that the search and seizure of data stored in the cellular telephone was supported by a sufficient exigent circumstance. If the government claims that an exigent circumstance existed, then Ms. Martinez-Jimenez moves this Court to hold an evidentiary hearing.

### 5. This search was not a "border search."

The search of Ms. Martinez-Jimenez cellular phone and its electronic content was not a permissible border search. "It is firmly established that the right of the sovereign to search at the borders supersedes that of the individual's privacy rights and that border searches," however, this right is "not without qualification and limitation." United States v. Soto-Soto, 598 F.2d 545, 548 (9th Cir. 1979). The federal statute governing border searches is limited with respect to the parties who may lawfully conduct the searches, and proximity or relationship to the border to be authorized by the statute as in pursuit of merchandise brought illegally into the country. Id. (citing 19 U.S.C. § 482(a) (2002)). In Alexander v. United States, 362 F.2d 379, 382 (9th Cir. 1966), the Ninth Circuit found that where a search for contraband by customs officers was not made at or in the immediate vicinity of the point of international border crossing, "the legality of the search must be tested by a determination whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with

1  reasonable certainty that any contraband which might be found in or on the vehicle at the time of search was

2  aboard the vehicle at the time of entry into the jurisdiction of the United States." In this case, the border

3  officials were not looking for contraband while manually browsing the electronic data in Ms. Martinez-

4  Jimenez cellular phone.

5      In United States v. Arnold, 454 F. Supp.2d 999 (C.D. Cal. 2006), the district court granted a

6  defendant's motion to suppress evidence obtained from a search of the electronic contents of his laptop

7  computer when he arrived at an airport on an international flight, based on a weighing of the intrusiveness of

8  the search and the lack of cause. The court reasoned that, "[a]lthough neither a warrant nor probable cause

9  is needed for ordinary searches of persons and things crossing the border, cause is required for more intrusive

10 border searches," and that "[c]ertain border searches are highly intrusive because the implicate the 'dignity

11 and privacy interests of the persons being searched.'" Id. at 1002 (citing United States v. Flores v. Montano,

12 541 U.S. 149, 152 (2004)). The court found that "opening and viewing confidential computer files"

13 implicated "dignity and privacy interests," and therefore constituted an "intrusive" search. Id. As has been

14 described above, the type of information that could be stored in Ms. Martinez-Jimenez cellular phone was

15 similar to that of a laptop, and the obtaining of a warrant would have been practicable and appropriate.

16 Therefore, the warrantless search and seizure of the electronic data stored on Ms. Martinez-Jimenez's cellular

17 telephone was not a valid border search.

18 **B.    The Search of Ms. Martinez-Jimenez Cellular Phone Violated the ECPA**

19     When the border officials searched and seized the electronic information stored in Ms. Martinez-

20 Jimenez's cellular phone, they did so in violation of the ECPA. Title II of the ECPA "generally proscribes

21 unauthorized access to stored wired or electronic communications." Steve Jackson Games, Inc. v. United

22 States Secret Service, 36 F.3d 457, 462 (5th Cir. 1994). Accessing of stored electronic communications is

23 governed by Title II of the ECPA, 18 U.S.C. § 2701, et seq. See Id. at 462. "Generally, a search warrant,

24 rather than a court order, is required to obtain access to the contents of a stored electronic communication."

25 Id. at 462 n.7; see also 18 U.S.C. § 2703(a). See United States v. Reyes, 922 F. Supp. 818 (S.D.N.Y. 1996)

26 (finding that Title II applies seizing stored data in a pager.) Therefore, because the government searched and

27 seized stored data on Ms. Martinez-Jimenez's phone in the absence of a search warrant, suppression of this

28 evidence is warranted.

1  **C.      All Evidence Seized as a Result of the Unlawful Searches and Seizures Must Be Suppressed.**

2       This Court should suppress all evidence discovered as a result of the unlawful search and seizure of

3  the electronic data stored on Ms. Martinez-Jimenez cellular phone.  "It is well established that the Fourth

4  Amendment's exclusionary rule applies to statements and evidence obtained as a product of illegal searches

5  and seizures."  United States v. Crawford, 372 F.3d 1048, 1054 (9th Cir. 2004) (citing Wong Sun v. United

6  States, 371 U.S. 471 484-88 (1963)).  "Evidence obtained by such illegal action of the police is 'fruit of the

7  poisonous tree,' warranting application of the exclusionary rule if, 'granting establishment of the primary

8  illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality

9  or instead by means sufficiently distinguishable to be purged of the primary taint.'"  Id. (citing Brown v.

10  Illinois, 422 U.S. 590, 599 (1975)).  Because the searching officers failed to obtain a warrant or Ms. Martinez-

11  Jimenez consent prior to searching and seizing the electronic data, and because this warrantless search is was

12  neither a permissible search incident to arrest, a permissible search due to exigent circumstances, a permissible

13  border search, nor any other exception to the warrant requirement, all evidence seized or derived from the

14  unlawful search must be suppressed.

15                                              **VI.**

16  **ANY STATEMENTS MADE BY MS. MARTINEZ-JIMENEZ SHOULD BE SUPPRESSED**

17       Ms. Martinez-Jimenez  moves to suppress any statements made at the time of her arrest on the

18  grounds that her Miranda waiver was not knowing, intelligent, and voluntary.  Moreover, Ms. Martinez-

19  Jimenez moves to suppress any other statements made on the grounds that those statements were not made

20  voluntarily.

21  **A.      The Government must demonstrate compliance with *Miranda*.**

22       In order for any statements made by Ms. Martinez-Jimenez to be admissible against her, the

23  government must demonstrate that they were obtained in compliance with the Miranda decision.

24       **1.      Ms. Martinez-Jimenez 's Waiver Must Be Voluntary, Knowing, and Intelligent.**

25       When interrogation continues without the presence of an attorney, and a statement results, the

26  government has a heavy burden to demonstrate that the defendant has intelligently and voluntarily waived his

27  privilege against self-incrimination.  Miranda, 384 U.S. at 475.  The court must indulge every reasonable

28  / / /

1 presumption against waiver of fundamental constitutional rights, so the burden on the government is great.

2 United States v. Heldt, 745 F. 2d 1275, 1277 (9th Cir. 1984).

3       In determining whether a waiver is voluntary, knowing, and intelligent, the court looks to the totality

4 of the circumstances surrounding the case. Edwards v. Arizona, 451 U.S. 477 (1981); United States v.

5 Garibay, 143 F.3d 534 (9th Cir. 1998). The Ninth Circuit has held that determination of the validity of a

6 Miranda waiver requires a two prong analysis: the waiver must be both (1) voluntary and (2) knowing and

7 intelligent. Derrick v. Peterson, 924 F. 2d 813 (9th Cir. 1990). The second prong requires an inquiry into

8 whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the

9 consequences of the decision to abandon it." Id. at 820-821 (quoting Colorado v. Spring, 479 U.S. 564, 573

10 (1987)). Not only must the waiver be uncoerced, then, it must also involve a "requisite level of

11 comprehension" before a court may conclude that Miranda rights have been legitimately waived. Id. (quoting

12 Colorado v. Spring, 479 U.S. at 573).

13       Unless and until Miranda warnings and a knowing and intelligent waiver are demonstrated by the

14 prosecution, no evidence obtained as a result of the interrogation can be used against the defendant. Miranda,

15 384 U.S. at 479. The government in this case must prove that Ms. Martinez-Jimenez waived her rights

16 intelligently and voluntarily. Ms. Martinez-Jimenez disputes any allegation that her waiver was knowing,

17 intelligent, and voluntarily.

18     **2.**    **Ms. Martinez-Jimenez's Statements Must be Voluntary.**

19       Even if Ms. Martinez-Jimenez's statements were made after a voluntary, knowing, and intelligent

20 waiver, they must have been made voluntarily, or they must be suppressed. The Supreme Court has held that

21 even where the procedural safeguards of Miranda are satisfied, a defendant in a criminal case is deprived of

22 due process of law if his conviction is founded on involuntary statements. Arizona v. Fulminante, 499 U.S.

23 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964); see also United States v. Davidson, 768 F.2d 1266,

24 1269 (11th Cir. 1985)("an accused is deprived of due process if his conviction rests wholly or partially upon

25 an involuntary confession, even if the statement is true, and even if there is ample independent evidence of

26 guilt."). The government has the burden of proving that statements are voluntary by a preponderance of the

27 evidence. Lego v. Twomey, 404 U.S. 477, 483 (1972). An accused's confession must result from an

28 "independent and informed choice of his own free will, possessing the capability to do so, his will not being

1 overborne by the pressures and circumstances swirling around him." <u>Martin v. Wainwright</u>, 770 F. 2d 918,

2 924 (11th Cir. 1985), <u>modified</u>, 781 F. 2d 185 (11th Cir.)  (quotations omitted).

3       To be considered voluntary, a statement must be the product of a rational intellect and a free will.

4 <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was overborne

5 in a particular case, the court must consider the totality of the circumstances.  <u>Schneckloth v. Bustamonte,</u> 412

6 U.S. 218, 226 (1973).[8]  A confession is deemed involuntary not only if coerced by physical intimidation, but

7 also if achieved through psychological pressure.  "The test is whether the confession was 'extracted by any

8 sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion

9 of any improper influence.'" <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976) (quoting <u>Bram v. United States</u>, 168 U.S.

10 532, 542-43 (1897)); <u>accord</u>, <u>United States v. Tingle</u>, 658 F.2d 1332, 1335 (9th Cir. 1981). Here, Ms.

11 Martinez-Jimenez's statements were involuntary.  An evidentiary hearing in this case will reveal this case is

12 indistinguishable from <u>United States v. Tingle</u>, 658 F.2d 1332 (9th Cir. 1981).  Accordingly, suppression of

13 Ms. Martinez-Jimenez's statements is required.

14 **B.      This Court Must Conduct an Evidentiary Hearing.**

15       Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury,

16 whether any statements made by Ms. Martinez-Jimenez are voluntary.  In addition, section 3501(b) requires

17 this Court to consider various enumerated factors, including whether Ms. Martinez-Jimenez understood the

18 nature of the charges against her and whether she understood her rights. Without evidence, this Court cannot

19 adequately consider these statutorily mandated factors.

20       Moreover, section 3501(a) requires this Court to make a factual determination.  Where a factual

21 determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12.  <u>See</u>

22 <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "`suppression hearings are often

23 as important as the trial itself,'" <u>Id.</u> at 610 (quoting <u>Waller v. Georgia</u>, 467 U.S. 39, 46 (1984)), these findings

24 / / /

25

26

27       [8] Among the factors which are considered are the youth of the accused, her lack of education, her
low intelligence, the lack of any advice to the accused of her constitutional rights, the length of the
detention, the repeated and prolonged nature of questioning, and the use of physical punishment

28 such as deprivation of food or sleep.

1 should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a

2 prosecutor's responsive pleading.

3 **VII.**

4 **THIS COURT SHOULD PRECLUDE THE GOVERNMENT FROM PRESENTING**
**HEARSAY STATEMENTS ABOUT SMUGGLING ARRANGEMENTS UNDER *CRAWFORD***

5

6     The Confrontation Clause forbids the use of hearsay against a criminal defendant at trial, if the

7 defendant is not afforded the right to confrontation.  See Crawford v. Washington, 124 S. Ct. 1354 (2004).

8 Under Federal Rule of Evidence 802, hearsay statements are inadmissible unless one or more hearsay

9 exceptions apply.  When a statement involves multiple levels of hearsay, each level must be independently

10 admissible for the statement to come into evidence.  Fed. R. Evid. 805.

11 **VIII.**

12 **THIS COURT SHOULD EXCLUDE ANY EXPERT WITNESSES OFFERED BY THE**
**GOVERNMENT**

13

14     Federal Rule of Criminal Procedure 16(a)(1)(E) mandates that "[a]t the defendant's request, the

15 government shall disclose to the defendant a written summary of testimony that the government intends to use

16 under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case in chief at trial . . ..  The

17 summary provided under this subdivision shall describe the witnesses' opinions, the bases and the reasons for

18 those opinions, and the witnesses' qualifications."  The obligation to provide this material is ongoing,

19 continuing prior to and during trial. Fed. R. Crim. P. 16(c).  When a party fails to comply with the discovery

20 rules set forth in Rule 16, exclusion is a proper remedy.  Fed. R. Crim. P. 16(d)(2).  See also Advisory

21 Committee Notes to 1997 Amendment (asserting that "[u]nder rule 16(a)(1)(E), as amended in 1993, the

22 defense is entitled to disclosure of certain information about expert witnesses which the government intends

23 to call during the trial" (emphasis added).

24     Thus far, the government has given no notice of any expert witness testimony.  If the government

25 seeks to offer expert testimony without (1) timely notifying the defense of the expert and his or her

26 qualifications; (2) providing a summary of the expected testimony; and (3) providing a summary of the bases

27 of the expert's opinion, this Court should exclude such witnesses from testifying at trial.  If the government

28 has not given expert notice by the motions in limine hearing date, Ms. Martinez-Jimenez respectfully requests

1 that this Court grant a motion in limine to give effect to the discovery requirements of Rule 16, and to afford

2 the accused the opportunity to prepare his defense in this case.

3 **IX.**

4 **THE COURT SHOULD NOT SEND THE INDICTMENT**
**INTO THE JURY ROOM DURING DELIBERATIONS**

5

6 In the commentary to Model Instruction 3.2.1, "Charge Against Defendant Not Evidence," the

7 Committee on Model Jury Instructions, in the Ninth Circuit Manual of Model Jury Instructions, strongly

8 recommends that the indictment not be sent into the jury room during deliberations. The commentary

9 observed that neither the Federal Rules of Criminal Procedure, nor case law, require sending a copy of the

10 indictment to the jury room because the indictment is not evidence.

11 Ms. Martinez-Jimenez urges this Court to follow the Committee's guidance. The language in the

12 instant indictment "tracks" the language of the charged statutes. Accordingly, it is probable that jurors will

13 be persuaded by the similarities alleged in the indictment returned by the grand jury and the elements which

14 must be proven in the charged statutes. Furthermore, the indictment recites that "the grand jury charges," and

15 this could persuade those jurors without experience with the grand jury system that another jury had already

16 found Ms. Martinez-Jimenez guilty. Ms. Martinez-Jimenez also requests that this Court caution the jury that

17 the indictment is not evidence. See United States v. Utz, 886 F.2d 1148, 1151-1152 (9th Cir. 1989).

18 **X.**

19 **THIS COURT SHOULD ALLOW ATTORNEY-CONDUCTED VOIR-DIRE**

20 Pursuant to Rule 24(a), Federal Rules of Criminal Procedure, to provide effective assistance of

21 counsel and to exercise Ms. Martinez-Jimenez' right to trial by an impartial jury, defense counsel requests the

22 opportunity to personally voir dire the prospective members of the jury.

23 **XI.**

24 **THIS COURT SHOULD ORDER PRODUCTION OF GRAND JURY TRANSCRIPTS**

25 The Court should order production of grand jury transcripts when the defense can show a

26 particularized need. The particularized need present in this case is that a witness may have testified before

27 the grand jury, who will likely testify at Ms. Martinez-Jimenez' trial. The government must produce a

28 transcript of a witness' testimony before the grand jury following the direct examination of a witness at trial.

1  18 U.S.C. § 3500; <u>Dennis v. United States</u>, 384 U.S. 855 (1966); Fed. R. Crim. 26.2(f)(3).  The defense

2  requests that the government make such transcripts available in advance of trial to facilitate the orderly

3  presentation of evidence and to remove any need for recess in the proceedings for defense counsel to examine

4  the statements pursuant to Fed. R. Crim. P. 26.2(d).

5      Additionally, Ms. Martinez-Jimenez moves for the production of grand jury transcripts, even if the

6  grand jury witness *does not* testify at trial.  If the government's grand jury witness was not the case agent in

7  this case, that witness likely testified based upon information provided by other agents.  The government has,

8  thus, adopted the witness' grand jury testimony by "manifest[ing] an adoption or belief in its truth."  <u>See</u> Fed.

9  R. Evid. 801(d)(2)(B).  The grand jury testimony also constitutes an admission "by a person authorized by the

10  party to make a statement concerning the subject matter," <u>see</u> Fed. R. Evid. 801(d)(2)(C), and constitutes

11  "statement[s] by the party's agent or servant concerning a matter within the scope of the agency or

12  employment, made during the existence of the relationship," <u>see</u> Fed. R. Evid. 801(d)(2)(D).

13      Furthermore, to the extent that any of the grand jury testimony in this case is in any way inconsistent

14  with the testimony adduced at trial, the grand jury testimony constitutes exculpatory impeachment evidence.

15  <u>See Giglio v. United States</u>, 405 U.S. 150 (1972).  As discussed above, such evidence would be admissible

16  as an adoptive admission pursuant to Rule 801(d)(2).  At a minimum, this Court should conduct an *in camera*

17  review of the grand jury testimony and order the transcript produced if it contains any testimony that might

18  be <u>Brady</u> material, or otherwise subject to production, as explained above.

19                                                        **XII.**

20  **THIS COURT SHOULD ORDER PRODUCTION OF JENCKS MATERIALS PRIOR TO TRIAL**

21      Ms. Martinez-Jimenez requests that this court order production of Jencks materials prior to trial.

22  Under Federal Rule of Criminal Procedure 26.2, Ms. Martinez-Jimenez will be entitled to any statement of

23  the witness in its possession that relates to the subject matter of the witness's testimony.  Fed.R.Crim.P.

24  26.2(a).

25      Ms. Martinez-Jimenez specifically requests that the court order production prior to trial in order to

26  ensure that no recess is necessary to (a) examine the statement or (b) prepare for its use.  Fed.R.Crim.P.

27  26.2(d).  Preparation for use may require further investigation and a lengthy recess during the course of trial.

28  In order to ensure an efficient trial and no waste of the court or the jury's time, Ms. Martinez-Jimenez

1    respectfully requests that this court order the government to turn over all Jencks materials one week before

2    trial.

3    **XIII.**

4    **THIS COURT SHOULD EXCLUDE EVIDENCE OF DEFENDANT'S DEMEANOR
      AND THE "IMPRESSIONS" OF THE GOVERNMENT WITNESSES**

5

6    Based on statements contained in the Report of Investigation, it is believed that government

7    witnesses may opine that Ms. Martinez-Jimenez was nervous when she interacted with agents, or otherwise

8    comment on her alleged demeanor. The defense files this motion to prevent the government's introducing this

9    demeanor evidence at trial.

10   **A.    Such Evidence Should Be Precluded Under Federal Rule of Evidence 403 Because Testimony
      That Someone Was "Nervous" Is Irrelevant and Overly Prejudicial.**

11

12   Rule 403 allows the Court to exclude relevant evidence if the "[p]robative value is substantially

13   outweighed by danger of unfair prejudice." Lay witness testimony regarding nervousness, absent some prior

14   knowledge of the defendant, has minimal, if any, relevance. United States v. Wald, 216 F.3d 1222, 1227 (10th

15   Cir.2000) (*en banc*) (evidence of nervousness "is of limited significance"[,] "particularly when [the agent] had

16   no prior acquaintance with the [defendant].""); United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994)

17   ("We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and

18   that the government's repetitive reliance on the nervousness . . . must be treated with caution"); see also Gall

19   v. Parker, 231 F.3d 265, 292 (6th Cir. 2000) (testimony that Gall seemed "nice [and] normal" and "not

20   nervous" error because—"we have long been skeptical of such lay testimony"); United States v. Burks, 547

21   F.2d 968, 970 (6th Cir. 1976) (stating that lay testimony that defendant did not appear "abnormal" by persons

22   "who had very limited opportunity to observe" him had little value), rev'd on other grounds, 437 U.S. 1, 98

23   S. Ct. 2141 (1978); United States v. Smith, 437 F.2d 538, 540-41 (6th Cir. 1970) (lay testimony as to mental

24   state lacks probative value when a witness' "direct knowledge of the defendant is brief and superficial.").[9]

25

26   _____

     [9]  In both Gall and Smith, mental state was the defense, and it was deemed error to have lay witnesses,
     without prior knowledge of the defendant, opine that he appeared "not nervous," Gall, 231 F.3d at 292, or that

27   "he did not appear abnormal," Smith, 437 F.2d at 540. Similarly, here, where a distinct mental state,
     knowledge, is the determinative issue, permitting witnesses without expertise and with no prior knowledge

28   of Ms. Martinez-Jimenez to testify to the converse—that is, that he *was* nervous—is equally erroneous.

1        In reversing a trial court's decision, the Tenth Circuit, in Fernandez, expressly noted, that: "[t]he

2   lower court's heavy reliance on nervousness as an important factor establishing reasonable suspicion is even

3   more troublesome given the complete lack of evidence in the record that [the police officer] had any prior

4   knowledge of Fernandez . . .." 18 F.3d at 879.

5        These cases demonstrate that the judiciary, in general, and the Ninth Circuit, specifically, places little

6   to no weight upon nervousness in making particular fact-based rulings under the lesser burdens of proof than

7   the beyond a reasonable doubt standard applicable at trial. See, e.g., United States v. Chavez-Valenzuela, 268

8   F.3d 719 (9th Cir. 2001) ("[N]ervousness during a traffic stop—even . . . extreme nervousness . . . in the

9   absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity .

10  . .."). For example, in Chavez-Valenzuela, Wald and Fernandez, nervousness was considered to be of little

11  to no probative value in a probable cause/reasonable suspicion context where evidentiary standards are relaxed

12  and *where there is no need to consider the prejudicial impact of such evidence.* Id.; Wald, 216 F.3d at 1227;

13  Fernandez, 18 F.3d at 879.

14       The reasoning underlying the minimal significance accorded to "nervousness" is that courts

15  recognize that "nervousness" has both an innocent and a guilty explanation because people confronted with

16  law enforcement often exhibit signs of nervousness, without having done anything wrong. See, e.g., Chavez-

17  Valenzuela, 268 F.3d at 725 ("Encounters with police are necessarily stressful for law-abiders and criminals

18  alike"); United States v. Fuentes-Cariaga, 209 F.3d 1140, 1142 (9th Cir. 2000) (recognizing that "drivers

19  stopped at the border (or anywhere else) can be nervous for many reasons, one being a natural unease when

20  confronted by an authority figure and another being fear of getting caught with contraband the person knows

21  he is carrying"); accord Wald, 208 F.3d at 907 (it is not uncommon for most citizens, even innocent ones, to

22  exhibit signs of "innocuous" nervousness when confronted by law enforcement); United States v. Wood, 106

23  F.3d 942, 947 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or

24  guilty—to exhibit signs of nervousness when confronted by a law enforcement officer."); Fernandez, 18 F.3d

25  at 879 (same); United States v. Diaz-Carreon, 915 F.2d 951, 954 (5th Cir. 1990) ("Nervousness, however, is

26  'a normal reaction to circumstances which one does not understand.' In the absence of facts suggesting that

27  the defendant's nervousness or anxiety derives from an underlying consciousness of criminal behavior,

28  / / /

1  evidence of nervousness is insufficient to support a finding of guilty knowledge");[10] <u>United States v.</u>

2  <u>Millan-Diaz</u>, 975 F.2d 720, 722 (10th Cir. 1992) (same); <u>United States v. Grant</u>, 920 F.2d 376, 386 (6th Cir.

3  1990) ("[n]ervousness is entirely consistent with innocent behavior, especially at an airport where a traveler

4  may be anticipating a long-awaited rendezvous with friends or family"); <u>United States v. Andrews</u>, 600 F.2d

5  563, 566, n.4 (6th Cir.1979) (noting inconsistent rationales taken by government in explaining nervousness).

6        In determining what can properly be considered in making reasonable suspicion/probable cause

7  determinations, it is improper for district courts to rely upon factors that lead to a "heads I win, tails you lose"

8  result for the prosecution. <u>Gonzalez-Rivera v. INS</u>, 22 F.3d 1441, 1447 (9th Cir. 1994) (noting that point with

9  respect to a driver's avoidance of eye contact with law enforcement the government argues that whether the

10  driver made eye contact or avoided it both are signs of guilt); <u>see also</u> <u>United States v. Lopez</u>, 564 F.2d 710

11  (5th Cir. 1977) (where a factor and its opposite can both be used to justify a stop, the court should not give

12  weight to either factor.). Nervousness is precisely such a factor, as recognized by the court in <u>Andrews</u>, 600

13  F.2d at 566, n.4, which discussed the fact that the government argues in some cases that "nervousness"

14  indicates guilty knowledge, while in others that its absence indicates the guilty knowledge of the calm and

15  collected criminal. Since it is inappropriate for courts to consider such a factor in a mere probable cause

16  calculus, concomitantly, a jury should not consider it at a far more important event, such as a trial[11]. Indeed,

17  we expect our judges to be able to put aside undue prejudice when the law recognizes that jurors cannot do

18  the same.

19  / / /

20  _____

21      [10] In <u>Diaz-Carreon</u>, the Fifth Circuit held that the "nervousness" was linked to consciousness of guilt,

22  but only because, in that case, "*before being told that agents had discovered marijuana in the pickup truck*,
Diaz-Carreon volunteered, 'If the truck is loaded, I didn't know about it.'" 915 F.2d at 954 (emphasis in

23  original). Here, no such link between any amorphous "nervous" behavior and consciousness of guilt exists.

24      [11] In the suppression context, courts are precluded from considering certain factors and, as a matter
of law, cannot rely upon them in finding probable cause or reasonable suspicion, such as race or ethnicity,

25  <u>United States v. Montero-Camargo</u>, 208 F.3d 1122, 1131-32 (9th Cir. 2000) (*en banc*). Because of its limited

26  probative value and the equivalent "guilty" and "innocent" explanation, courts indicate that "nervousness" also
should be accorded little to no consideration. While a factor such as race is not permitted to be the subject

27  of testimony indicating guilty knowledge at a trial for other reasons, one such reason, *i.e*, that it has no
relevance for purposes of ascertaining guilty knowledge, applies equally to nervousness. Just as race would

28  not be a permissible subject of testimony at trial, neither should testimony about nervousness be admitted.

1       It is well-established that jurors will assign undue weight to a law enforcement officer's testimony

2   that an individual was "nervous" and equate nervous behavior with suspicious behavior. See, e.g., United

3   States v. Gutierrez, 995 F.2d 169, 172 (9th Cir. 1993) (testimony of law enforcement officers "'often carries

4   an aura of special reliability and trustworthiness,'") (quoting United States v. Espinosa, 827 F.2d 604, 613 (9th

5   Cir. 1987)).  It is also true that, as is previously recognized, testimony that someone is "nervous" in the

6   presence of law enforcement, is ambiguous.  For these reasons, evidence that someone was "nervous" should

7   fall in the same category as evidence that an individual remained silent when confronted with law enforcement

8   accusations.  That silence evidence, apart from any constitutional protection, is also inadmissible pursuant to

9   Fed. R. of Evid. 403.  United States v. Hale, 422 U.S. 171 (1975).  Thus, any slight probative value which

10  could exist is insufficient to justify its admission.  All told, any proposed testimony that Ms. Martinez-Jimenez

11  displayed signs of nervousness is irrelevant to the issue at hand and should be excluded under Rule 403 as

12  being substantially more prejudicial than probative.

13  **B.        Admission of Nervousness Testimony Violates Rules 701 & 704(b).**

14       Admission of demeanor evidence should be excluded if it is couched in terms of a law enforcement

15  witness' personal opinion about Ms. Martinez-Jimenez' behavior, i.e., "she was nervous."  An inspector or

16  agent's personal opinion is irrelevant, and such opinion testimony, based on no prior knowledge of the

17  defendant and upon a very limited observation opportunity, violates Rule 701.  Rule 701 provides that a lay

18  witness can only testify to opinions or inferences that are (a) rationally based on the perception of the witness,

19  (b) helpful to a clear understanding of the witness' testimony or to the determination of a fact in issue, and (c)

20  not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  In Gonzalez-

21  Rivera v. INS, 22 F.3d 1441 (9th Cir. 1994), the Ninth Circuit held that an INS agent's testimony at a

22  suppression hearing that an individual was nervous must be disregarded because it was not based upon

23  "reliable, objective evidence."  Id. at 1447.  There, when explored, the basis for the agent's testimony was that

24  the individual appeared to have a "dry mouth."  The court stated that, absent reliable, objective testimony that

25  people who are nervous have a dry mouth, as opposed to just being thirsty, this inference was nothing more

26  than "subjective feelings [which] do [] not provide any rational basis for separating out the illegal aliens from

27  the American citizens and legal aliens."  Id.  Likewise, possible testimony in the instant case that

28  / / /

1  Ms. Martinez-Jimenez was "nervous" is nothing more than a subjective judgment based upon no prior

2  knowledge of her.  Accordingly, the jury cannot consider it.

3                                                  **XIV.**

4                        **THIS COURT SHOULD ALLOW EACH JUROR TO HAVE**
                         **A SEPARATE COPY OF THE APPROVED JURY INSTRUCTIONS**

5

6         Juries consist of lay people, who are required to follow the law.  Their responsibility becomes more

7  difficult when all twelve jurors have access to only one copy of the instructions.  Often, each juror does not

8  have an opportunity to even read or understand the critical instructions.  Consequently, jurors fail to

9  understand the government's burden of proving a case beyond a reasonable doubt and the defendant's

10  constitutional right not to testify and present evidence in his own defense.

11         In this case, there are numerous elements the government must prove to convict Ms. Martinez-

12  Jimenez.  Although this Court will instruct the jury on each of these elements, each juror also should be

13  provided a written copy of the jury instructions, so that each juror may properly, effectively, and efficiently

14  perform his or her function of determining whether the government has proven *each* element beyond a

15  reasonable doubt.[12]

16                                                  **XV.**

17         **THIS COURT SHOULD PRECLUDE THE ADMISSION OF 404(B) AND 609 EVIDENCE**

18  **A.      404(b) Evidence.**

19         **1.      There Has Been No Notice of 404(b) Evidence, and Its Introduction Will Cause**
                    **Prejudice and Inefficiency in the Trial.**

20

21         Federal Rule of Evidence 404(b) requires that the government provide "reasonable notice in advance

22  of trial" of any evidence of "other crimes, wrongs, or acts" it plans to introduce.  Fed. R. Evid. 404(b).  The

23  notice requirement is triggered when timely requested by the defendant.  United States v. Vega, 188 F.3d 1150,

24  1154 (9th Cir. 1999).  Ms. Martinez-Jimenez requested notice and production of any such evidence in her

25  motion to compel discovery, submitted on July 23, 2008.  In the government's response in opposition to the

26  _____

27         [12]  Ms. Martinez-Jimenez is willing to pay the costs for the additional copies of the jury instructions.

28  Defense counsel is willing to make the copies, as well.

1   motion, it was stated that defendant would be provided with notice of any 404(b) evidence. To date,

2   Ms. Martinez-Jimenez has received no notice of the government's intent to offer 404(b) evidence at trial. As

3   Ms. Martinez-Jimenez was previously convicted of transportation of illegal aliens, in violation of Title 8,

4   United States Code 1324(a)(1)(A)(2), it is anticipated that the government will seek to introduce evidence of

5   this conviction at trial. Because there has been no timely notice, the government should be precluded from

6   introducing evidence of this conviction at trial, regardless of whether or not Ms. Martinez-Jimenez takes the

7   witness stand.

8         **2.    The Government Has Not Satisfied the Four Requirements It Must Satisfy to Meet Its Burden In Showing Admissibility.**

9

10       In determining whether "other acts" evidence may be admitted, the government must prove that:

11         (1)     It proves a material element of the offense for which the defendant is now charged;
           (2)     It is similar to the charged conduct;

12         (3)     It is based upon sufficient evidence; and
           (4)     It is not too remote in time.

13

14   United States v. Houser, 929 F.2d 1369, 1373 (9th Cir. 1990).

15         **3.    The Prejudice of the Evidence Outweighs Its Probative Value.**

16       In addition, the government must prove that the probative value of the conduct outweighs its

17   prejudicial effect. Id.; United States v. Alfonso, 759 F.2d 728, 739 (9th Cir. 1985) (government bears burden

18   of proving 404(b) admissibility. Here, the prejudicial effect substantially outweighs the probative value. The

19   government seeks to introduce the proposed 404(b) evidence as pure propensity evidence, nothing more. The

20   prejudicial effect of introducing this evidence to the jury would be difficult to overestimate. The average

21   person is quite likely to believe that because Ms. Martinez-Jimenez pled guilty to a related crime in the past,

22   she is much more likely to have done it this time also. Even though the facts surrounding the two incidents

23   are different, both cases involve the transportation of illegal aliens. In the previous case, Ms. Martinez-

24   Jimenez pled guilty and admitted that she agreed to transport illegal aliens by car. That incident occurred near

25   the Otay Lakes area. Here, it is alleged that she helped to guide an illegal alien on horseback near the beach,

26   after assisting him (in a manner so far undisclosed by the government) in entering the United States. Because

27   of the factual differences between the two cases, the probative value of the evidence is very low. When the

28   probative value of the evidence is substantial outweighed by the prejudicial effect, which is the case here, the

1   evidence is inadmissible.  In addition, there is nothing to suggest a common scheme or plan, or any other

2   theory contemplated by 404(b) that would allow the admission of this evidence.

3   **B.        609 Evidence.**

4           Here, Ms. Martinez-Jimenez timely requested notice of proposed Rule 404(b) evidence in h

5   discovery requests to the government.  In the event that the government indicates an intention to introduce 609

6   evidence, it is Ms. Martinez-Jimenez' position that this evidence is inadmissible because its prejudicial effect

7   strongly outweighs any probative value.

8

9                                             **XVI.**

10                  **THIS COURT SHOULD EXCLUDE POVERTY EVIDENCE**

11          It is impermissible for the prosecution to elicit testimony or to comment in any fashion upon the

12  difficult financial circumstances of the defendant.   Such comments regarding poverty are forbidden.

13  <u>United States v. Romero-Avila</u>, 210 F.3d 1017, 1022 n.2 (9th Cir. 2000).

14          Even before the <u>Romero-Avila</u> case, the Ninth Circuit had concluded as much.  In <u>United States v.</u>

15  <u>Mitchell</u>, 172 F.3d 1104 (9th Cir.1999), the defendant was convicted of bank robbery and, at trial, the

16  prosecution offered evidence that the defendant was poor to prove the defendant's motive to commit the bank

17  robbery.  In reversing the conviction, the court stated that:

18                  Poverty as proof of motive has in many cases little tendency to make theft
                    more probable.  Lack of money gives a person an interest in having more.
19                  But so does desire for money, without poverty.  A rich man's greed is as
                    much a motive to steal as a poor man's poverty.  Proof of either, without
20                  more, is likely to amount to a great deal of unfair prejudice with little
                    probative value.
21

22  <u>Id.</u> at 1108-09.  To be admissible, the court stated that the poverty evidence must be accompanied by

23  something more, such as an "unexplained, abrupt change in circumstances."  <u>Id.</u> at 1108-09.  Ninth Circuit

24  precedent suggests that poverty evidence is only admissible if accompanied by evidence of a specific and

25  immediate financial need.  <u>See United States v. Jackson</u>, 882 F.2d 1444, 1453 (9th Cir.1989) (Reinhardt, J.,

26  dissenting); <u>see also id.</u> at 1450 (majority opinion) (noting that "poverty alone does not indicate a motive to

27  commit, or the commission of, a crime"); <u>see also United States v. Bensimon</u>, 172 F.3d 1121, 1129 (9th Cir.

28  1999) (fact that defendant in bankruptcy at time crime committed does not demonstrate particular need for

1  money); <u>Mitchell</u>, 172 F.3d 1104, 1108-09 (9th Cir.1999) (evidence of poverty, absent "an unexplained abrupt

2  change of circumstances," is inadmissible to prove motive); <u>United States v. Grissom</u>, 645 F.2d 461, 469 n.11

3  (5th Cir. 1981) ("[I]t is almost always grossly improper for any lawyer representing the United States

4  government to comment on the **indigency** of a defendant.").

5       "Poverty comments" may not be made even when the evidence commented upon is admitted by the

6  defense. <u>Romero-Avila</u>, 210 F.3d 1017, 1022 and n.2 (9th Cir. 2000). <u>Romero-Avila</u> specifically rejected

7  the very argument that the defendant is barred from challenging comments upon improper poverty testimony

8  because he elicited it during cross-examination, and held that the government's comments were plain error.

9  As such, regardless of any evidence proffered by the defendant as to her financial circumstances, any reference

10 to the defendant's financial situation must be excluded.

11                                  **XVII.**

12       **THE COURT SHOULD EXCLUDE THE GOVERNMENT'S CASE AGENT**

13       The Court may not exclude "a person whose presence is shown by a party to be essential to the

14 presentation of the party's case" during a trial. Fed. R. Evid. 615(3). The government has made no showing

15 that its case agent is such a person.

16                                  **XVIII.**

17       **THIS COURT SHOULD SEVER DEFENDANTS.**

18       The Court should sever Ms. Martinez-Jimenez' case from her co-defendant Ernest Guerrero's as they

19 may have antagonistic and mutually exclusive defenses at trial. "Mutually exclusive defenses are said to exist

20 when acquittal of one co-defendant would necessarily call for the conviction of the other." <u>United States v.</u>

21 <u>Tootick</u>, 952 F.2d 1078, 1081 (9th Cir. 1991). In <u>Tootick</u>, the Ninth Circuit noted that antagonistic defenses

22 greatly prejudice co-defendants because: 1) defense counsel becomes essentially a second prosecutor, without

23 being bound by the limitations on prosecutors; 2) perverse incentives are created that may affect a defendant's

24 decision to testify, position on evidentiary issues, etc.; and 3) jurors may convict both defendant rather than

25 sort out the complexities of antagonistic defenses.

26       In <u>United States v. Mayfield</u>, 189 F.3d 895 (9th Cir. 1999), two defendants stood trial in a drug case.

27 One defendant's theory of the case was that the other defendant alone was guilty, and he vigorously argued

28 that to the jury. <u>Id</u>. at 898-99. On appeal, the Ninth Circuit reversed stating that "the probability of reversible

1  prejudice increases as the defenses move beyond the merely inconsistent to the antagonistic." Id. (quoting

2  Zafiro v. United States, 506 U.S. 539, 542 (1993) (Stevens, J., concurring in the judgement). Defendant's who

3  accuse each other bring the effect of a second prosecutor into the case with respect to their co-

4  defendant...[c]ross examination of the government's witnesses becomes an opportunity to emphasize the

5  exclusive guilt of the other defendant ...[c]losing arguments allows a final opening for co-defendant's counsel

6  to portray the other defendant as the sole perpetrator of the crime." Id. at 900 (quoting  Tootick, 952 F.2d at

7  1081.

8        Here, Mr. Guerrero and Ms. Martinez-Jimenez were riding on the same horse, but Mr. Guerrero was

9  in front, guiding the horse.  During his deposition, the material witness stated only that communicated with

10  Mr. Guerrero and not Ms. Martinez-Jimenez.  In addition, it is believed that Mr. Guerrero is related to the

11  woman who owned the horse that both defendant's were riding.  This woman is believed to be a convicted

12  alien-smuggler herself.

13        Knowing this, defense counsel may become the proverbial "second prosecutor" and use any and

14  every opportunity to prove that Mr. Guerrero is the only true guilty party in this case.  If the jury believes this

15  defense, they will have to acquit Ms. Martinez-Jimenez and convict Mr. Guerrero. Mr. Guerrero, however,

16  also has the right to avoid being prosecuted by both the United States Attorney and defense counsel at the

17  same trial. Therefore, severance is required.

18                                   **XIX.**

19                              **<u>CONCLUSION</u>**

20        For the foregoing reasons, Ms. Martinez-Jimenez respectfully requests that the Court grant the above

21  motions and motions in limine.

22                                        Respectfully submitted,

23

24  DATED:        September 2, 2008           /s/ Victor Pippins
25                                           **VICTOR PIPPINS**
                                             **MICHELLE BETANCOURT**
26                                           Federal Defenders of San Diego, Inc.
                                             Attorneys for Ms. Martinez-Jimenez

27

28

1

<u>**CERTIFICATE OF SERVICE**</u>

2        Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of his

3   information and belief, and that a copy of the foregoing document has been served this day upon:

4                                   Wayne Charles Mayer
                                      wcmayer@aol.com;
5
                                  Stephen Frederick Miller
6   Steve.Miller2@usdoj.gov,efile.dkt.gc1@usdoj.gov,Maria.Richardson@usdoj.gov; and

7                                       Scott Pactor
                                   scottpactor@yahoo.com
8

9                                   Respectfully submitted,

10

11  DATED:    September 2, 2008            /s/ Victor Pippins
                                        **VICTOR PIPPINS**
12                                      Federal Defenders of San Diego, Inc.
                                        Attorneys for Soledad Martinez-Jimenez
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28